**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF OHIO**
**WESTERN DIVISION**

Cathy D. Ferguson,                                      :          Case No. 3:08CV1478

     Plaintiff,                                        :

v.                                                               :

Commissioner of Social Security,              :          **MEMORANDUM DECISION AND**
                                                                        **ORDER**

     Defendant.                                     :

Plaintiff seeks judicial review, pursuant to 42 U.S.C.  § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*.  Pending are the parties' Briefs on the Merits and Plaintiff's Reply (Docket Nos. 23, 28 and 29).   Based upon the evidence that follows, the Commissioner's decision is affirmed.

## I.  PROCEDURAL BACKGROUND

On September 1, 2001, Plaintiff applied for DIB and SSI alleging that she had been disabled since February 18, 2001 (Tr. 138-140).  Her request for benefits was denied initially and upon reconsideration (Tr. 112-115; 118-120; 440-442; 444-447).  On June 8, 2004, Plaintiff, represented by counsel, and Vocational Expert (VE) W. Bruce Walsh appeared at a hearing conducted by

Administrative Law Judge (ALJ) William L. Hafer (Tr. 480).  On May 25, 2005, the ALJ rendered an unfavorable decision, finding that Plaintiff was not entitled to a period of disability or to DIB benefits (Tr. 91-107).  The Appeals Council granted Plaintiff's request for review and remanded the case to the ALJ (Tr. 135-137).  Plaintiff and her counsel appeared before ALJ Hafer on November 28, 2005 (Tr. 520).  The ALJ rendered an unfavorable decision on July 25, 2006 (Tr. 19-70).  The Appeals Council denied Plaintiff's request for review on April 16, 2008, rendering the ALJ's decision the final decision of the Commissioner (Tr. 7-9).  Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision on June 19, 2008.

## II.  FACTUAL BACKGROUND

### A.    THE INITIAL HEARING

#### 1.    PLAINTIFF'S TESTIMONY

Plaintiff, a high school graduate, weighed 140 pounds and was 5'3" tall (Tr. 486).  She resided with her spouse who provided her sole support (Tr. 484, 485).

Plaintiff had been employed at American Honda in the mid 1990s in the warehouse (Tr. 489).  Later, she worked as a material handler at Honda (Tr. 486-487).  In this capacity, she removed totes weighing approximately fifteen to twenty pounds from a conveyer (Tr. 487).  She quit her job because the symptoms associated with panic attacks became more pronounced (Tr. 508, 509).  Plaintiff was also employed by R and D Maintenance, a janitorial service (Tr. 487-488).  In that capacity, she lifted five gallon buckets and trash cans.  She was also a relief home parent at a halfway house during weekends.  She did no lifting in her job as relief parent (Tr. 488-489).

Plaintiff's life stressors had escalated since she was raped at nine years of age (Tr. 513).  However, the panic attacks commenced during the past seven to eight years preceding the hearing (Tr.

507).  At the time the attacks began, Plaintiff was employed.  The panic attacks interfered with her ability to work.  In fact, once she had an attack at work and was asked to leave the work premises (Tr. 490).  She noticed that exposure to the public precipitated attacks (Tr. 512, 514).

During a panic attack, Plaintiff exhibited signs of paranoia, shortness of breath, muscle spasms, tremors, nervousness and claustrophobia (Tr. 490, 491, 503, 505, 506).  She estimated that she had up to six attacks weekly and that each attack was up to five hours in duration (Tr. 491).  Plaintiff admitted that occasionally, she had auditory hallucinations.  The devil's voice, which she heard once or twice daily, attempted to force her to commit suicide (Tr. 499, 500).  Sometimes the voice was inaudible (Tr. 500).  Because the voice was similar to a voice she heard on television, she did not watch television (Tr. 501, 510).  She also avoided opening the door to get the mail (Tr. 510).

Plaintiff was prescribed medication that she took daily and Xanax to be taken as needed (Tr. 493, 495, 497).  These medications allowed her to "sleep it off."  The side effects include drowsiness and an inability to focus (Tr. 490).  The difficulty was that she did not sleep all night on the medication (Tr. 502).  She did, however, sleep six to seven hours daily (Tr. 502).

During the day, Plaintiff listened to gospel music and read the Bible.  She did not attend church if she felt an anxiety attack "coming on beforehand."  When she did attend church, she remained in the rear of the church so that she could leave (Tr. 507).

2.      THE VE'S TESTIMONY.

The VE testified that Plaintiff's past position as a home attendant was performed at the semiskilled, light exertional level; however, the DICTIONARY OF OCCUPATIONAL TITLES (DOT) described that work as semiskilled, medium exertional level work.  Plaintiff's work as a material handler was considered light exertional level work (Tr. 515).  Plaintiff's past relevant work as a cleaner and a

3

material handler could be performed by a hypothetical person of Plaintiff's age, education and work experience, who was limited to unskilled work that is performed in a setting with no public contact and only superficial contact with supervisors and co-workers (Tr. 516).  Assuming a physical limitation to sedentary work, approximately 25% of the sedentary, unskilled base could be performed.  Examples of such work would be a packer, a marker or labeler and an inspector.  There were approximately 100, 100 and 150, respectively, of such jobs in the local economy.  There were 2,300, 3,000 and 2,100, respectively, such positions state-wide (Tr. 517).

**B.    REMAND HEARING.**

Plaintiff was the only witness to give sworn testimony.  Only the testimony that supplements and/or alters Plaintiff's previous testimony is described here.

Plaintiff's primary care physician, Dr. Ruth Erulkar, treated her for back pain and monitored her medication intake (Tr. 533, 534, 546).  Plaintiff had been prescribed medication for inflammation (Tr. 531, 532).  Plaintiff was seeing a psychiatrist at least once a month.  The psychiatrist prescribed medication for the treatment of panic attacks, paranoia and anxiety (Tr. 526).  The psychiatrist prescribed medication that assisted in relieving the auditory hallucinations; however, Plaintiff continued to hear unidentifiable voices (Tr. 527).

Plaintiff had panic attacks approximately five times weekly.  She suffered palpitations during the onset of an attack.  After an attack, she experienced muscle spasms in her back.  She took a pain pill to relieve back pain (Tr. 528).

Plaintiff estimated that she could sit for approximately 45 minutes before she had to stand up and stretch (Tr. 530).  She could possibly walk a half of a block and lift up to eight pounds (Tr. 531).  She could walk up and down steps, incurring pain between her hips and knees (Tr. 542).  She had a problem

manipulating because of wrist and index finger weaknesses (Tr. 532).  Plaintiff added hot pads and ice to her treatment regimen (Tr. 533).

Plaintiff estimated that she slept five to six hours of sleep nightly (Tr. 535).  She now took a sleep aid when she was awakened after sleeping for three to four hours (Tr. 534).  Unless she had back pain, she did not "nap" during the day.  Occasionally, she cooked.  Otherwise, her daughter and spouse cleaned (Tr. 535).

Plaintiff no longer attended church because the anxiety, panic and paranoia attacks worsened.  Instead, a church associate came to her home to conduct bible study (Tr. 536).  Although there were weeks that she did not leave her home, Plaintiff had attended a family dinner during the previous weekend.  She talked to family members telephonically, keeping the telephone away from her ear so that she could not hear voices in the background (Tr. 536, 537). She continued to smoke a pack of cigarettes every 2½ days (Tr. 537).

Plaintiff described a recent episode during which her whole back was paralyzed (Tr. 539).  She requested injections but her treating physician treated her back pain by supplementing her medications with an anti-inflammatory drug (Tr. 541).  Sometimes the tightening in her chest felt like a heart attack (Tr. 539).

Plaintiff suffered from tingling down her legs, arms and back (Tr. 541, 542).  The back pain was sometimes a byproduct of the panic attack (Tr. 543).  The tingling in her arms radiated to her wrists.  She had trouble with tightness in her hips (Tr. 542).

### III.  MEDICAL EVIDENCE

A.  MEDICAL RECORDS SUBMITTED TO THE ALJ.

On June 1, 1990, Plaintiff suffered a work-related injury.  She was examined for a program of

rehabilitation including active pain management, aquatics, possible conditioning and work hardening to treat cervical strain (Tr. 240).  Plaintiff cancelled treatments on July 17, 1990, because she felt better (Tr. 264).

Plaintiff commenced treatment with Dr. James B. Hoover, a physical medicine and rehabilitation specialist, on February 27, 1992, for chronic cervical shoulder girdle strain.   An aggressive reconditioning program, lasting eight to twelve weeks, was prescribed (Tr. 344).  The program was never approved, so Dr. Hoover conducted a re-evaluation on January 12, 1003, finding that Plaintiff continued to have neck and shoulder pain.  Injections at three trigger points in the right shoulder were made (Tr. 342).  Plaintiff reported to Dr. Hoover in January 1999 that she was doing reasonably well and taking medications as needed (Tr. 341).

Dr. Hoover reported in March and September 2000, that Plaintiff used the medication reasonably; therefore, her pain was managed reasonably well (Tr. 339, 340).  Dr. Hoover refilled Plaintiff's pain medications and added an antianxiety agent on January 19, 2001 (Tr. 338).  In March 2001, Plaintiff's overall pain level was mild to moderate (Tr. 337).  Dr. Hoover refilled all of Plaintiff's medication on March 3, 2001 (Tr. 336).

On November 5, 2001, Dr. Hoover provided a list of Plaintiff's impairments to a public agency, specifically noting that Plaintiff had musculoskeletal pain, fibromyalgia or myofascial pain, cervical degenerative disc disease and cervical post laminectomy syndrome (Tr. 335).  Finally, on May 21, 2002, Dr. Hoover, confirmed that Plaintiff had multiple musculoskeletal problems affecting her neck, shoulder, back and hips (Tr. 333).

From February 2, 1992, to March 5, 1993, Plaintiff attended physical therapy weekly.  Unable to obtain her goals of managing pain while engaging in normal activities including work, Plaintiff was

6

discharged from therapy on April 5, 1993 (Tr. 261).  On February 2, 1993, Plaintiff was diagnosed with cervical and shoulder girdle spasm and myofascial pain (Tr. 262).  In August 1993, Plaintiff underwent an anterior diskectomy and interbody fusion at C5-6 and C6-7 in the cervical spine (Tr. 231).  On November 2, 1993, a treatment plan employing pain control modalities was prescribed (Tr. 260).  On September 12, 1995, Plaintiff was evaluated for treatment of pain management in her entire spine, shoulders and buttocks (Tr. 250).  She stopped attending the physical therapy sessions in December 1995 and she was discharged from physical therapy in January 1996 (Tr. 248).

On January 4, 2002, Plaintiff was evaluated for a pulmonary embolism.  Although clinical correlation was recommenced, Dr. Douglas Cifuentes, an internal medicine physician, determined that the lung abnormality raised the possibility of an acute inflammatory process such as pneumonia or sarcoidosis (Tr. 298).

Dr. James F. Sunbury, Ph.d., a member of the American Board of Professional Psychology, interviewed Plaintiff on January 8, 2002, and diagnosed her with schizophrenia, anxiety disorder and moderate symptoms or moderate difficulty in social or occupational functioning.  He opined that Plaintiff's ability to relate to others was mildly to moderately limited, her ability to understand, follow instructions and perform simple repetitive tasks was not limited and her ability to withstand the stress and pressures associated with day-to-day work activity was moderately limited due to residual symptoms of schizophrenia (Tr. 316).

Beginning on February 1, 2002, Dr. Mary Ann Gonzalez treated Plaintiff for chronic low back pain and exacerbation of pain in the lower back with various drug therapies (Tr. 374-383).

On February 5, 2002, Dr. Ronald J. Wainz, an internist, administered a pulmonary function test and found that Plaintiff's lung volumes were normal and there was minimal diffusion defect (Tr. 317-

318).

On February 12, 2002, Dr. Young C. Choy attributed the small asymmetrical densities in Plaintiff's breasts to fibrocystic changes (Tr. 386).

On February 25, 2002, Dr. Sushil M. Sethi, a general surgeon, determined that Plaintiff suffered from nonspecific back and neck pain but found no evidence of specific mental illness. He did note that Plaintiff's family situation was the source of anxiety (Tr. 326). Dr. Sethi opined that Plaintiff's range of motion in her cervical spine, dorsolumbar spine, hips, knees, ankles, shoulders, elbows, wrists and hands/fingers was within normal parameters (Tr. 329, 330).

On March 10, 2002, Dr. Roseann F. Umana, Ph.D., found that Plaintiff had a medical history of temporary psychosis after a death in the family, disturbance of mood characterized by decreased energy and anxiety, not otherwise specified (Tr. 352, 353, 355). It was her opinion that Plaintiff had no restriction on activities of daily living, no difficulty in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace (Tr. 360).

On April 18, 2002, the digital X-ray of Plaintiff's chest showed no active cardiopulmonary disease. There was evidence of linear horizontal type densities within the right middle lobe and parenchymal scarring (Tr. 384).

Plaintiff was diagnosed with a psychotic disorder, not otherwise specified, and serious symptoms or any serious impairment in social, occupational, or school functioning on May 23, 2002 (Tr. 392).

Licensed Social Worker Colleen Lewis conducted a diagnostic assessment on April 29, 2002, diagnosing Plaintiff with generalized anxiety disorder and serious symptoms or any serious impairment in social, occupational or school functioning (Tr. 399-400). Thereafter, Dr. John Ross prescribed Xanax on August 19, 2003 (Tr. 401). He noticed on September 24, 2003, that Plaintiff had become reclusive,

8

talking only to her family.  The anxiety/panic attacks continued (Tr. 408).  Dr. Ross expanded his diagnosis to include agoraphobia on November 19, 2003 (Tr. 406).

Dr. John M. Miga, Ph.D., a psychologist, conducted an clinical evaluation on July 30, 2002, deferring his diagnosis pending more information as to Plaintiff's mental and personality disorders.  He found the self-report data of questionable reliability (Tr. 349).

Dr. Jessica Wilson, an emergency medicine physician, treated Plaintiff for acute exacerbation of chronic back pain on September 11, 2002.  Pain medication was prescribed (Tr. 364).  Dr. Michael Mattin, a family practitioner, treated Plaintiff for lower back pain with medication, ice and rest on September 24, 2002 (Tr. 368).  The attendant lumbrosacral spine study showed disc space narrowing at L4-L5 and to a lessor extent, L5-S1.  There was evidence of mild to moderate ankylosis of the mid to lower lumbar spine and lower thoracic spine and arthritic changes in the posterior elements of the lower lumbar spine at the L5-S1disc space (Tr. 370).

The magnetic resonance imaging (MRI) of the lumbar spine taken on November 8, 2002 revealed a mild diffuse disc bulge at L4-5 and L5-S1.  Mild degenerative changes of the facet joints of L4-5 and L5-S1 were also noted.  There was no evidence of disc protrusion or central spinal stenosis of the lumbar spine (Tr. 373).

Dr. A. O'Leary, M. D., diagnosed Plaintiff with a psychotic disorder, not otherwise specified, on December 2, 2002 (Tr. 388).

On December 17, 2002, Dr. Hoover noted that the regimen of medication that Plaintiff had consumed for several years was effective and allowed her to function reasonably well.  He continued her medication with a plan to change medication as needed (Tr. 419).  Dr. Hoover refilled her prescriptions for those medications designed to relieve Plaintiff of musculoskeletal pain on May 21,

2004.  He noted that Plaintiff was treating with a psychiatrist (Tr. 418).  In September, 2005, Dr. Hoover prescribed a medication designed to relieve discomfort associated with severe painful muscle spasms (Tr. 417).

Plaintiff's glucose level was elevated on January 3, 2003 (Tr. 273).

The lipid panel results garnered from blood samples collected on May 12, 2005 showed exceptionally high cholesterol and triglyceride levels.  In fact, the triglyceride levels were too high for an accurate low-density lipoprotein estimation (Tr. 425-426).

**B.**    **MEDICAL RECORDS SUBMITTED TO THE APPEALS COUNCIL.**

Plaintiff was admitted to the hospital on July 16, 1993 for treatment of major depression with psychotic features (Tr. 475).  There was evidence of polysubstance abuse and nicotine dependence (Tr. 471).  The discharge plan included counseling to enhance mental skills and a chemical dependency evaluation (Tr. 472).

On September 1, 1993, Plaintiff presented to the hospital with symptoms of depression, psychosis and paranoia (Tr. 455).  Her condition on discharge was stable with no homicidal or suicidal ideations (Tr. 454).

In July 2007, Dr. Carol A. Loeffler, Ph.D., administered the Minnesota Multiphasic Personality Inventory 2 (MMPI-2) (Tr. 477).  Apparently, there were several omissions so Dr. Loeffler permitted Plaintiff to complete the test at a later date (Tr. 476).  Dr. Loeffler admitted that the test results were technically invalid, however, she gained an insight into Plaintiff's mental impairment.  She noted that Plaintiff struggled to maintain her hold on reality and Plaintiff struggled with distorted thinking and delusions (Tr. 476-477).   Plaintiff's scores were suggestive of feeling hopeless, withdrawn, overwhelmed and guilt ridden.  Plaintiff's scores were also indicative of a person with rigid rituals and

10

superstitious phobias (Tr. 476).  Plaintiff was not fixated on death but she wished for Jehovah to take her life.  Dr. Loeffler agreed to provide treatment (Tr. 477).

In September 2007, Dr. Loeffler administered the Symptom Checklist 90-R, an instrument designed to elicit claimant's statement of his or her symptoms.  Dr. Loeffler opined that Plaintiff's mental health issues were severe, that her mental health issues may worsen and that she was at a greater risk for hospitalization (Tr. 478).  Her final diagnostic impression included a diagnoses of panic disorder with agoraphobia, dysthymia and delusional disorder.  It was her opinion that Plaintiff's mental illness affected her functioning and ability to engage in normal activities (Tr. 479).

## V.  STANDARD OF DISABILITY

DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively:

First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a

finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VI. THE ALJ'S FINDINGS

Upon review of the entire record, the ALJ made the following findings:

1.   Plaintiff met the insured status for purposes of entitlement to a period of disability and DIB under Title II of the Act expired on December 31, 2004.  There was no insured status requirements for eligibility to SSI under Title XVI.

2.   Plaintiff had not engaged in substantial gainful activity since February 18, 2001, the alleged onset date.

3.   Plaintiff had the following severe medical impairments:  degenerative disc disease and osteoarthritis of the cervical spine, status post anterior discectomy and inner body fusion at C5-6 and C6-7 on August 18, 1993, degenerative disc disease and osteoarthritis of the lumbar spine, hypertension, schizophrenia and panic disorder.  These impairments do not alone or in combination meet or equal the level of severity described in the Listing, nor have they done so at any time since February 18, 2001.

12

4.     Plaintiff had the residual functional capacity to lift and/or carry twenty five pounds frequently, lift and/or carry fifty pounds occasionally, sit, stand or walk six hours each in an eight-hour period, frequently stoop, kneel, crouch, crawl and climb stairs. Plaintiff could never climb ladders, ropes or scaffolds.  She was limited to unskilled work that was performed in settings with no public contact and only superficial contact with supervisors and co-workers.  Work settings should be those in which there were no or very few rigid deadlines and no high production standards or quotas.

5.     Plaintiff could return to her past relevant work as a cleaner and material handler.

6.     Plaintiff was not under a disability at any time since the alleged onset date of February 18, 2001 and she was not disabled within the meaning of the Act.

(Tr. 19-70).

## VII.  STANDARD OF REVIEW

The federal district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g).  Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision in a civil action.  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

13

*Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra,* 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key, supra*, 109 F.3d at 273).

## VII. DISCUSSION

Plaintiff's claims are: (1) the ALJ failed to follow the dictates of SSR 96-5p, (2) the ALJ erred in placing total reliance on evidence of the medical consultants, (3) that she is credible, (4) Plaintiff's impairments meet 12.03 and (5) Plaintiff's impairments meet 12.06 of the Listing.

### 1. DID THE ALJ COMPLY WITH SSR 96-5P?

Plaintiff contends that the ALJ erred in evaluating medical source opinion evidence consistent with SSR 96-5p, choosing instead, to rely on his own judgment. Specifically, the ALJ relied on the Social Security Administration medical consultants, not Plaintiff's treating sources, when assessing residual functional capacity.

Opinions from any medical source on issues reserved to the Commissioner must never be ignored. TITLES II AND XVI: MEDICAL SOURCE OPINIONS ON ISSUES RESERVED TO THE COMMISSIONER,

14

SSR 96-5P, 1996 WL 374183, *3 (July 2, 1996). The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved for the Commissioner. SSR 96-5p at *3. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. SSR 96-5p at *3. In evaluating the opinions of medical sources on issues reserved for the Commissioner, the adjudicator must apply the applicable factors in 20 C. F. R. 404.1527(d) and 416.927(d). SSR 96-5p at *3. However, pursuant to paragraph (e)(2) of 20 C. F. R. 404.1527 and 416.927, the adjudicator is precluded from giving any special significance to the source; e.g., giving a treating source's opinion controlling weight, when weighing these opinions on issues reserved for the Commissioner. SSR 96-5p at *3. The regulations expressly provide that the responsibility for deciding a claimant's residual functional capacity rests with the ALJ when cases are decided at the administrative hearing. *Webb v. Commissioner of Social Security,* 368 F. 3d 629, 633 (6th Cir. 2004).

The ALJ conducted an extensive examination of opinions in weighing the evidence as it relates to Plaintiff's functional restrictions. He reviewed and considered the opinions of Drs. Hoover, Wainz, Raia, O'Leary, Gonzalez, Sethi, Miga and Eruklar, all of whom examined Plaintiff and/or provided treatment. He neither ignored Plaintiff's treating sources nor gave their opinions special significance. The ALJ reviewed and considered the results from the liver function studies, X-rays, diagnostic and clinical tests. The ALJ considered Plaintiff's testimony as well as her complaints (Tr. 61-69). Plaintiff has not persuaded the Magistrate that the ALJ's decision regarding Plaintiff's residual functional capacity is based on his own judgment instead of the judgment of licensed physicians. The ALJ's

15

finding of residual functional capacity is based on the record as a whole, thus, complying with the dictates of SSR 96-5p, 20 C.F.R. §§ 404.1527(e)(2) and 416.927(e)(2)

## 2.     THE ALJ'S RELIANCE ON MEDICAL CONSULTANTS

Plaintiff contends that the ALJ legally erred in placing total reliance on the medical evidence of the Social Security Administration's medical or psychological consultants.  The Magistrate presumes that Plaintiff is referring to the opinions of Drs. Miga, Sunbury, Sethi, Wagner and Umana (Tr. 61, 63, 67, 69).

ALJs are not bound by any findings made by state agency medical or psychological consultants, or other program physicians or psychologists.  20 C.F.R. § § 416.927(f)(d)(i) and 404.1527(f)(d)(i) (Thomson Reuters/West 2009).  However, state agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.  20 C.F.R. § § 416.927(f)(d)(i) and 404.1527(f)(d)(i) (Thomson Reuters/West 2009).  Therefore, ALJs **must** consider findings of state agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether the claimant is disabled.  20 C.F.R. § § 416.927(f)(d)(i) and 404.1527(f)(d)(i) (Thomson Reuters/West 2009) (*citing* 20 C. F. R. §§ 416.912(b)(6) and 404.1512(b)(6)).

When an ALJ considers findings of a state agency medical or psychological consultant or other program physician or psychologist, the ALJ will evaluate the findings using relevant factors in paragraphs (a) through (e) of this section, such as the physician's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of the opinions.  20 C.F.R.

16

§ § 416.927(f)(d)(ii) and 404.1527(f)(d)(ii) (Thomson Reuters/West 2009).  Unless the treating source's opinion is given controlling weight, the ALJ must explain in the decision the weight given to the opinions of a state agency medical or psychological consultant or other program physician or psychologist, as the ALJ must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who are not employed by the Administration.  20 C.F.R. § § 416.927(f)(d)(i) and 404.1527(f)(d)(i) (Thomson Reuters/West 2009)

The ALJ considered and rejected the opinions of Drs. Miga, Sethi, Umana, Erulkar and Wagner (Tr. 69).  Dr. Sethi's opinions were considered but rejected because he did not have available to him all of the medical evidence that was a part of the record (Tr. 69).  The ALJ rejected the opinions of Drs. Miga, Umana and Wagner as they were inconsistent with the opinion of Dr. Erulkar that indicated Plaintiff had a severe mental impairment (Tr. 69).  The ALJ gave considerable deference to Dr. Erulkar's opinions; consequently, he was not obliged to explain in the decision the weight given to Dr. Sunbury's opinions.

In the alternative, Plaintiff argues that this case should be remanded to the Commissioner for consideration of the opinions of Drs. Hoover, Sethi and Loeffler (Tr. 324-326, 336-344, 476-479).  The Magistrate finds that the ALJ did not disregard the psychological evaluations of Dr. Hoover or Sethi.  In fact, when assessing residual functional capacity, the ALJ relied on Dr. Hoover's opinions (Tr. 62, 66, 67).  The ALJ acknowledged but discounted Dr. Sethi's opinions since they were not based on all of the evidence in the record (Tr. 67, 68, 69).  The ALJ did not review the opinions of Dr. Loeffler because such reports were proffered for the first time to the Appeals Council.  The Magistrate is not persuaded that remand to the Commissioner, so that the ALJ can consider Dr. Loeffler's opinions, is justified.

17

To justify a remand under the sixth sentence of 42 U.S.C. § 405(g) based on evidence not before the ALJ at the time of decision, three prerequisites must exist. *Hammad v. Astrue,* 2009 WL 700745, *2 (N. D. Ohio 2009). The additional evidence must be "new" and "material," and "good cause" must exist for the failure to present the evidence to the ALJ. *Id.* (*citing Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001). Evidence is "new" only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Id.* (*citing Sullivan v. Finkelstein,* 110 S.Ct. 2658, 2664 (1990)). Evidence is "material" only if there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* at *3. For good cause to exist, there must be a "reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* at *3 (*citing Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 711 (6th Cir. 1988)).

The Magistrate finds that in this case one of the three prerequisites are not met. Dr. Loeffler prepared the letters during the pendency of the request for review by the Appeals Council. The evidence presented by Dr. Loeffler was clearly "new". Because these letters were "new", Plaintiff had good cause for her failure to present these letters for inclusion in the record prior to the hearing.

The letters, however, are immaterial. Dr. Loeffler did provide professional psychological services to Plaintiff. Her conclusions were based on the results from the MMPI-2, the results of which she claimed were "technically invalidated" because Plaintiff was overwhelmed at the time the test was administered. Consequently, she did not complete the test simultaneously. She completed the test at another time (Tr. 476, 478). Based on the results from the MMPI-2, Dr. Loeffler confirmed evidence that was already in the record, specifically, that Plaintiff was paranoid, withdrawn, prone to auditory hallucinations, unable to leave the house and subject to panic attacks (Tr. 477).

18

Dr. Loeffler administered the symptom checklist, requiring Plaintiff to identify her symptoms. There were no empirical results from this test (Tr. 478-479). At best this instrument assisted Dr. Loeffler in making a clinical assessment of Plaintiff's impairment and treatment options. The letter that Dr. Loeffler wrote describing the results of this test provides nothing new that is material to the determination of disability. Remand of this case for consideration of immaterial evidence would not alter the ALJ's decision that Plaintiff was not disabled or entitled to a period of disability.

**3.      DID THE ALJ ERR IN ASSESSING CREDIBILITY?**

Plaintiff contends that since her impairments are supported by substantial medical evidence, the ALJ should have found her credible.

The ALJ, not the reviewing court, must evaluate the credibility of witnesses, including that of the claimant. *Rogers*, *supra*, 486 F.3d at 247 (*citing Walters, supra,* 127 F.3d at 531; *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk, supra*, 667 F.2d at 538). The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Id.* (*citing* SOC. RUL. 96-7p, 1996 WL 374186, at * 4). Such credibility determinations must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.* The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.* Consistency of the various pieces of information contained in the record should be scrutinized. *Id.* Consistency between a claimant's symptom complaints and the other evidence in the record tend to support the credibility of the claimant,

19

while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.* at 247-248.

Blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. *Id.* at 248. In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation. *Id.* at 248, fn. 5. The articulation of reasons for crediting or rejecting particular sources of evidence is absolutely essential for meaningful appellate review. *Id.* (*citing Hurst v. Secretary of Health and Human Services*, 753 F.2d 517, 519 (6th Cir. 1985) (*quoting Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

In the present case, the ALJ found an "indicia of truthfulness" in Plaintiff's assessment of her impairments. Her impairments were clearly documented by her treating sources. However, the ALJ based his credibility finding on evidence in the entire case record including medical signs and laboratory findings, acknowledging that Plaintiff had some severe symptoms and that her severe symptoms were capable of causing pain. The ALJ was not persuaded that Plaintiff's testimony regarding the intensity or persistence of her symptoms was supported by objective medical evidence. Thus, he made a determination of Plaintiff's credibility in conjunction with her allegations and entire medical record. The ALJ discounted Plaintiff's allegations to the extent that her assessment of functional limitations and their severity was not supported by the medical evidence. Since the ALJ's decision is supported by substantial evidence and he complied with the Administration's requirements for assessing credibility, the Magistrate affirms his findings.

4.     ARE PLAINTIFF'S IMPAIRMENTS OF THE SEVERITY TO MEET 12.03 OF THE LISTING?

Plaintiff contends that her impairment rises to the level of severity to meet 12.03 of the Listing.

A.     PART A.

Title 20 C. F. R. Pt. 404, Subpt. P, App. 1, describes the requirements for a claimant to show disability based on schizophrenia, paranoia and other psychotic disorders, characterized by the onset of psychotic features with deterioration from a previous level of functioning.  The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.  20 C. F. R. Pt. 404, Subpt. P, App.1, 12.03 (Thomson Reuters/West 2009).

Under Part A, there must be medically documented persistence, either continuous or intermittent, of one or more of the following:  (1) delusions or hallucinations; or (2) catatonic or other grossly disorganized behavior; or (3) emotional withdrawal and/or isolation and (4) incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following: (a). blunt affect; or (b) flat affect; or (c) inappropriate affect; or (d) emotional withdrawal and/or isolation.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.03(A)(1)-(4) (Thomson Reuters/West 2009).

Although her symptoms and signs were being addressed by medication or psychosocial support, Plaintiff also failed to demonstrate, by medically documented evidence, that her psychotic disorders lasted for at least two years and that there was a causal connection between them and the inability to engage in, at a minimum, basic work activities.  There is medically documented evidence that Plaintiff was diagnosed and/or treated for schizophrenia (Tr. 267, 316), temporary psychosis (Tr. 352), hallucinations (Tr. 392), paranoia (Tr. 334) and panic disorder with agoraphobia (Tr. 479).  In her new patient profile completed on August 14, 2001, Dr. Raia noted that Plaintiff had a past medical history of schizophrenia (Tr. 267).  Dr. Sunbury diagnosed Plaintiff with schizophrenia on January 11, 2002, but specified that Plaintiff was no longer having any prominent psychotic symptoms (Tr. 315-316).  Thus, there is no documented evidence of persistent schizophrenia.  Plaintiff's assertions that she heard voices are not medically documented.  She testified at both hearings that she heard voices.  In May 2002,

21

she told her counselor that she heard voices (Tr. 392).  When examined by Dr. Sunbury, Plaintiff did not exhibit any delusional thinking (Tr. 316).

This documentation is indicative that these medically documented impairments were situational and/or sporadic.  The documented medical evidence does not show that these impairments were either continuous or intermittent. These subjective observations lack the clarity and severity sufficient to correlate with Part A of 12.03 of the Listing.

B.      PART B.

Under Part B, the impairments must result in at least two of the following functional limitations: (1) a marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.03(B)(1)-(4) (Thomson Reuters/West 2009).  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.03(C) (Thomson Reuters 2009) (*see* 20 C. F. R. §§ 404.1520a and 416.920a).

1.      ACTIVITIES OF DAILY LIVING.

Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for the claimant's grooming and hygiene, using telephones and directories, and using a post office.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.03(C)(1) (Thomson Reuters 2009).  In the context of the overall situation, the SSA will assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.03(C)(1) (Thomson Reuters 2009).  The SSA

22

will determine the extent to which the claimant is capable of initiating and participating in activities independent of supervision or direction.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.03(C)(1) (Thomson Reuters 2009).

By her own admission Plaintiff performed household activities when she felt up to it (Tr. 348). She passed the time by listening to gospel music and reading her bible (Tr. 506-507).  In fact, Plaintiff told Dr. Sunbury on January 8, 2002, that she cleaned, cooked, did the laundry, washed dishes, exercised, attended bible study and other church activities (Tr. 315).  Dr. Sunbury noted that Plaintiff's ability to perform day to day work activities was moderately limited due to life stressors and pressures (Tr. 316).  In 2007, Dr. Loeffler noted that Plaintiff was able to maintain her personal hygiene on a consistent basis and cook at times if the ingredients were provided.  Plaintiff was unable to drive or shop.  She relied on her husband to conduct business matters (Tr. 479).  Dr. Umana found that Plaintiff had no restriction on her activities of daily living and they were not limited (Tr. 360).  This medically documented evidence showed that Plaintiff had at best, mild to moderate difficulties in daily living (Tr. 316, 348-349, 478-479, 360, 418, 427).  This evidence is not definitive of serious interference of Plaintiff's ability to function independently, appropriately, effectively, and on a sustained basis.

2.      SOCIAL FUNCTIONING.

The terms "social functioning" refer to an individual's capacity to interact appropriately and communicate effectively with other individuals.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.00(C)(2) (Thomson Reuters 2009).  Social functioning includes the ability to get along with others, e.g., family members, friends, neighbors, grocery clerks, landlords, bus drivers, etc.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.00(C)(2) (Thomson Reuters 2009).  Impaired social functioning may be demonstrated by a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships,

23

social isolation, etc.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.00(C)(2) (Thomson Reuters 2009).

Strength in social functioning may be documented by an individual's ability to initiate social contacts

with others, communicate clearly with others, interact and actively participate in group activities, etc.

Cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity also

need to be considered.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.00(C)(2) (Thomson Reuters 2009).

Social functioning in work situations may involve interactions with the public, responding appropriately

to persons in authority, e.g., supervisors, or cooperative behaviors involving coworkers.  20 C. F. R. Pt.

404, Subpt. P, App. 1, 12.00(C)(2) (Thomson Reuters 2009).

During the course of addressing multiple musculoskeletal problems, Plaintiff told Dr. Hoover

that she had difficulty being around other people (Tr. 333).  Dr. Loeffler opined that Plaintiff could not

develop relationships but she was able to participate in minimal family events (Tr. 479).  Dr. Miga

opined that Plaintiff had the ability to relate to others including co-workers and supervisors (Tr. 349).

Likewise, Dr. Umana opined that Plaintiff had no difficulties in maintaining social functioning (Tr. 360).

There is no documented evidence that Plaintiff had difficulty interacting appropriately and

communicating effectively with physicians.

This evidence does not demonstrate the extent of Plaintiff's capacity to interact appropriately

and communicate effectively with other individuals, including family, or that she had a history of

impaired social functioning.  There is no evidence that rises to the level of a marked limitation in

activities of social functioning.

3.    DIFFICULTIES IN MAINTAINING CONCENTRATION, PERSISTENCE OR PACE.

The terms "concentration, persistence, or pace" refer to the ability to sustain focused attention

and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly

24

found in work settings.  *See* 20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.00(C)(3) (Thomson Reuters 2009). Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.00(C)(3) (Thomson Reuters 2009).  In addition, major limitations in this area can often be assessed through clinical examination or psychological testing.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.00(C)(3) (Thomson Reuters 2009).  Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.00(C)(3) (Thomson Reuters 2009).

Plaintiff contends that she must engage in a level of planning before attempting the simplest of activities.  This level of planning is indicative of a person with marked limitations in concentration, persistence and pace.  Plaintiff directed the Court's attention to Dr. Loeffler's report (Tr. 476-479).

In 2007, Dr. Loeffler explained that after conducting eleven psychological counseling sessions during six months, Plaintiff was paranoid to the extent that she could not concentrate for any period of time on a particular topic (Tr. 479).  However, Dr. Sunbury commented that Plaintiff's ability to maintain attention to perform simple repetitive tasks was not limited (Tr. 316).  Dr. Miga noted that Plaintiff's difficulty in maintaining concentration, persistence or pace was mildly limited (Tr. 360). During an interview, Dr. Miga noted that Plaintiff had the ability to maintain attention on tasks requiring concentration (Tr. 349).  Although Dr. O'Leary did not conduct a formal evaluation, at the point of treatment in May 2002, Plaintiff's memory and concentration were "grossly intact" (Tr. 392).  The licensed social workers who conducted a diagnostic assessment on May 23, 2002, adopted assertions made by Plaintiff and her husband that she had auditory hallucinations (Tr. 392).

Assuming that these opinions are based on clinical examination, none of them measure or address Plaintiff's ability to sustain focused attention and concentration sufficiently long to permit the

25

timely and appropriate completion of tasks commonly found in work settings.  There is a lack of medically documented evidence to meet this criteria.

4       DETERIORATION OR DECOMPENSATION IN WORK OR WORK-LIKE SETTINGS.

Deterioration or decompensation in work or work-like settings refers to repeated failure to adapt to stressful circumstances which cause the individual either to withdraw from that situation or to experience exacerbation of signs and symptoms (i.e., decompensation) with an accompanying difficulty in maintaining activities of daily living, social relationships, and/or maintaining concentration, persistence, or pace (i.e., deterioration which may include deterioration of adaptive behaviors.  20 C. F. R.  Pt. 220, App. 1, 12,00(C)(4) (Thomson Reuters 2009).  Stresses common to the work environment include decisions, attendance, schedules, completing tasks, interactions with supervisors, interactions with peers, etc.  20 C. F. R.  Pt. 220, App. 1, 12,00(C)(4) (Thomson Reuters 2009).

Plaintiff recounted one panic attack at work and she was asked to leave the premises (Tr. 490). Otherwise, there is no documented evidence of repeated failure to adapt to stressful circumstances which caused the individual either to withdraw from that situation or to experience exacerbation of signs and symptoms.

C.      Part C.

Section C requires a medically documented history of a chronic schizophrenia, paranoia, or other psychotic disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:  (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside

26

a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.03(C)(1)-(3) (Thomson Reuters/West 2009).

This prong of the test is satisfied only if Plaintiff presented a current history of one or more years of inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. She did not. The evidence shows that she has consistently functioned inside a highly supportive living arrangement which included support from her husband and daughter. There is no medically documented evidence of her ability or inability to function outside that environment. Since Plaintiff has failed to present evidence of a documented history of a chronic schizophrenia, paranoia, or other psychotic disorder of at least two years' duration or evidence of repeated episodes of deterioration or decompensation, she failed to satisfy the requirements of Section C.

        D.     CONCLUSION.

Plaintiff failed to present evidence from which the ALJ could conclude that the required level of severity of impairments in 12.03 of the Listing was met.

**5.     ARE PLAINTIFF'S IMPAIRMENTS OF THE SEVERITY TO MEET 12.06 OF THE LISTING?**

Plaintiff argues that her anxiety related disorders satisfy Part A (1)(c)(2)(3) and (5) and  Part B (1), (2), (3) and (4) of 12.06 of the Listing.

Under 12.06 of the Listing, Anxiety Related Disorders, anxiety must be either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.06 (Thomson Reuters/West 2009). The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied. 20 C.F.R. Pt. 404, Subpt. P,

App. 1, 12.06 (Thomson Reuters/West 2009).

Under "A", there must a medically documented findings of at least one of the following: (1) generalized persistent anxiety accompanied by three out of four of the following signs or symptoms: (a) motor tension; or (b) autonomic hyperactivity; or (c) apprehensive expectation; or (d) vigilance and scanning; or (2) a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or (3) recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or (4) recurrent obsessions or compulsions which are a source of marked distress; or (5) recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; and (B) resulting in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration; or (C) resulting in complete inability to function independently outside the area of one's home.

Even if the Magistrate finds that Plaintiff suffers from a generalized persistent anxiety, there is a lack of evidence from which the ALJ could find motor tension; autonomic hyperactivity; apprehensive expectation; vigilance and scanning; or persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation. At best, Plaintiff expressed fear of going to work because of possible panic attacks and she exhibited fear when she refused to leave the familiar setting of home (Tr. 428, 429, 430, 433). During the clinical interview with Dr. Sethi, Plaintiff recalled when she was raped and when her husband disappeared. Neither recollection appeared to be recurrent or intrusive to the extent that they caused marked distress (Tr. 324, 337).

28

The Magistrate reiterates that there is a lack of medically documented evidence to support a finding of marked restriction of activities of daily living; maintaining social functioning; or maintaining concentration, persistence, or pace; nor repeated episodes of decompensation.  The medical sources found that Plaintiff had moderate difficulties in daily living, maintaining social functioning or maintaining concentration, persistence or pace (Tr. 316, 349, 360, 418).

When the entire record is considered, the evidence is insufficient to show that Plaintiff's anxiety related disorders satisfied 12.06 of the Listing.  The ALJ's determination that Plaintiff's anxiety related disorders did not meet 12.06 of the Listing is supported by the evidence.

## **CONCLUSION**

For these reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**


/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   September 29, 2009

29